Good morning. May it please the Court. My name is Kurt Mayer. I'm a Deputy Federal Public Defender in Los Angeles, and I represent Mr. Serrano in his appeal before this Court. We've argued to this Court that the Court should reverse Mr. Serrano's convictions because the District Court erred and let the prosecutor ask Mr. Serrano if the government's case agent had lied in her testimony to the jury. Let me ask you a question about that because I think you have to demonstrate that the conduct that you're complaining of was somehow prejudicial. Yes, Your Honor. And the question was, of course, you know what it was. You've read it 14 times. And the inspector, meaning Kugel, was lying when she said that you told her that you were suspicious from day one. But his answer is no. So his answer is no, she's not lying. And if you look back, you can see why because he says the statement was just screwed up and misinterpreted. So he never, the prosecutor never forced the defendant to say that the agent was lying. And doesn't that reflect somehow on whether this was prejudicial because he had an explanation for that? Well, Your Honor, if I may, I would say that he did because if you look at what he said after that. Yeah, I see that. I would be answering the question right now if I knew something was wrong. The crux of what he's asking Mr. Serrano about is was she lying when she said that you knew from the beginning that there was something wrong? Yeah, the question is definitely wrong. But the answer was no, she's not lying. So what we're really worried about in prohibiting that kind of question, you know, forcing somebody into a contest like that, it just didn't happen. But his explanation, as I'm repeating myself, was, hey, the written statement was, you know, it wasn't really what I intended to say. There was a translation mix-up. So there isn't any evidence that the agent was lying. That wasn't his position. Our position is that that was his position because when he says I wouldn't be here answering the question right now if I knew something was wrong, that's directly contradictory to what the agent testified. Yeah, but his explanation was that there was a screw-up, not that she was lying. See what I mean? I understand what the Court is saying. Yes, I do, Your Honor. But be that as it may, I still think that the problem that we have here is when that question is asked, it pits Mr. Serrano. Yeah, there isn't any question about it. The question is W-R-O-N-G. Right. But then the next question that we have to answer is whether it was somehow harmful or prejudicial, according to whatever the right standard is. Right. And we believe that the question was improper. I'm not buying the plain air standard, so. Very well, Your Honor. Thank you. I can't speak for them. I'm not really buying it either, so I'll just let you know. So, I mean, everyone agrees that the question was improper. Well, it's how it paints Mr. Serrano in this context. The jury is looking at somebody who's been asked by the prosecutor to call a witness that they're looking at every day in the government's case agent a liar. It also implies to the jury that the prosecutor knows who's telling the truth, and that person happens to be Inspector Kugel. So your position would be we really don't care what the answer is. Once the question is out there, that bell has been rung. Well, I mean, I still stand by my point. I understand that. But if we just take that away for a minute, yes, in this particular case, that is true because you have to look at how it might have affected the jury's decision in this particular case. Now, Mr. Serrano. So is it fair to look at the jury instructions? Because there are a ton of jury instructions that talk about you are the sole judges of the credibility. Questions aren't evidence, only answers. Your Honor, I know that's in, I think it was in Combs that they talked, the Court talked about that. But it has to be a specific instruction that's given at the time that the question is asked. In other words, the judge would have had to say at that point to the jury, you have to disregard that and any implications that come from that question. He never did that. Let's assume we accept your premise, but then we move to the next question. Tell us how your client was damaged in this case. Well, first let me start by saying that the question itself pits him against the agent. He had to show the jury, had to persuade the jury that he was a credible witness and that the inspector's recollection was incorrect or inaccurate or incomplete or that it should just not be believed. And then when he's asked this particular question, he's, and the Court lets the prosecutor ask the question. Mr. Sermano's left depicted as kind of an absurd, manipulative or conniving, desperate person. But if we go even beyond that, if we talk about, I'll take the eight factors that the government lists in their brief as showing that there was no prejudice here, I would submit that they actually do show prejudice. And that is because Now this is the government's burden, right? It's the government's burden to show, it's more probable not that there was no prejudice. It's the government's burden to show that there was no prejudice. Okay. Right. And so those particular factors that they're listing there are only incriminating the context if you believe that Mr. Sermano knew from the beginning that there was something wrong with this transaction. And that's why here when he's asked that question, his credibility is so crucial. He provided a plausible explanation. Could I just interrupt there? Because that was one question I had. The only, the question at issue went to the inspector's statement about defendant said that he was suspicious from day one. But it wasn't necessary for the government to show he was suspicious from day one, just that he had the knowledge during the course of the various activities. And it didn't seem to me that that particular statement vitiated the rest of the evidence that was presented to the jury. Maybe you could enlighten me on that. Yes, Your Honor. The reason we say that is because his defense was that he had no knowledge or no belief that he was involved in some type of fraudulent scheme. And therefore, he couldn't have had any intent to defraud. If you start with the premise that the government was asking that he knew from the beginning that there was something not right with this transaction but then went forward with it anyway, then you can imply that he had the intent to defraud the bank throughout the conspiracy. However, if you start from the premise which was Mr. Serrano's, that he didn't know, that he was simply doing something that he was instructed to do, and that he never suspected that there was anything wrong about what he was doing, then his explanations for all eight of those factors that the government lists are plausible. And that's what we're saying is the problem with the question, because that question necessarily affects his credibility with the jury. So there was evidence that during the course of his transactions that he made certifications that were untrue, that he received e-mails telling him to lie, that he used alibis, that he referred to people who didn't exist as being in charge. And so it seemed like there was ample testimony or evidence during the course of the trial showing that, from which the jury could infer he was doing things which he knew were not true and that were part of a scheme. And then there was his sworn statement saying he knew that the price had been jacked up, I think was the quote. Why is that vitiated by whether he knew on day one or not whether the transaction was fishy? Because of the context of how those particular factors. In other words, when he, his belief, his defense was that he didn't know that this was a fraud. He was involved in some kind of fraud. He provided plausible explanations for those factors. For example, when he gave those names, Francisco, Eladio, and Jay Reyes, he gave those names because he was being asked questions by either the bank or the vendors, and he didn't have answers for them because he has no experience in this type of transaction. You know, you call that plausible. I just don't think that's plausible. I mean, I made up all these fake names in connection with all this other fake stuff, and it's because I didn't have answers, so I told them I was somebody I wasn't? Well, that doesn't sound plausible. Initially, Your Honor, it is plausible because the first time that he did it, the first time he came across or the first time he used the name Jay Reyes was when he had a vendor call him and say, ask him questions, and he kept saying, I don't know. And the vendor got upset with him, asked him, why are you inquiring of us if you can't even talk to me about what you're asking for? And he, Mr. Serrano, was upset by that, and so rather than make him embarrass himself again, he just said, that's Jay Reyes. He'll get back with you. So that he could talk to the people who actually knew what was going on with the transaction, that being the Ongs. And the same thing goes with the bank when he used that name. It's not that I don't appreciate what the Court is saying. I understand that the Court is saying that, and this is the government's thing, is that he was dishonest throughout this transaction. Look at all these things. Prepared false commercial invoices, packing lists, supplier certificates, made representations he didn't purchase anything, nor ship goods to the Philippines. I mean, everything you look at was phony. I agree. If you look at it from that perspective, that everything he was doing was dishonest. But if you take it from the beginning, that he didn't know that he was involved, that he was being involved in a fraudulent transaction. If you consider his background, that he's undereducated, he's a simple man, he's had a humble background, he doesn't speak English that well, he has no experience whatsoever in these transactions. There was enough evidence there to make what he said about, we could talk specifically about these documents, plausible. He certainly, he didn't do anything that was in those three documents that he submitted to the bank personally, but he had a belief that those were being done, and that belief was derived from e-mails that he was receiving from the Philippines, and specifically, if the Court would look at Government Exhibit 21, the sub-exhibits 6, 7, 13, and 16, talk about that, Il Defonso Ong, the person who was in the office, who was in charge of the transaction, had already shipped items out, or had already shipped out the items that were listed in those three documents. Now, that's right. Do the Government have the burden of showing specific intent to defraud the Export-Import Bank? Yes, they did. Specific intent. And so, what was the evidence of specific intent? There was no direct evidence, right? Right. And that was our point about this whole issue here, is that the only two people that could testify, that could give direct evidence about whether Mr. Serrano knew that he was involved in a fraud, and therefore intended to call the bank. He had specific intent to defraud the Export-Import Bank? No, it's whether he intended to defraud the bank, that being the first international bank. And so, the only two people that could testify about that were Inspector Kugel and Mr. Serrano, on the particular point of, did he know from the beginning that he was involved in fraud? He didn't have to. As Judge Akita pointed out, he didn't have to. The Government didn't have to show he knew from the beginning, only that at some point he formed the specific intent to defraud. Because all of these things were steps toward the ultimate fraudulent act. But our, that's true, but our position is that he presented a plausible explanation that would show that he did not know from the beginning, and didn't know until after it was all over. And your argument today really boils down to, the jury would have found it was plausible except for this question that was asked, which painted him as a liar and pitted him against the agent. Right. He had provided a plausible explanation for what he did. I'm not saying it would have carried the day and he would have been found not guilty, had this question not been asked. But that's not really the standard here. If he presented a plausible explanation, and if he hadn't been presented in that light to the jury by the Government, in other words, if they hadn't initiated his credibility with the jury in that way, then he presented something that was entirely plausible. I might be more persuaded to agree with you if his answer to the question hadn't been no, and I'm going over this again, but he explained he wasn't accusing the agent of lying. They just got it wrong. Ever since the transaction was lost in translation, he meant to write that he had been worried ever since after the transaction. So that's completely consistent with the idea that Kugel didn't lie. Be that as it may, Your Honor, I still think that's plausible, too. I imagine that it would be. But it's still how you see, how you view it in the context of this particular trial. These were the only two witnesses that could testify about what he said on that particular point. By the prosecutor asking that question, he's putting him in the position of, or he's giving the jury the inference that he knows who's telling the truth, and it happens to be Inspector Kugel. Whatever explanation Mr. Serrano gives for this particular question, be it how Your Honor interprets it or how we interpret it, it doesn't matter. It doesn't matter what his explanation is. The bottom line is that Kugel's point being portrayed as somebody who can't be trusted and shouldn't be trusted by the jury. All right. Well, you're over your time. Thank you. May it please the Court. I'm Ellen Meltzer with the Department of Justice in Washington, D.C. Regardless of what standard of review this Court uses, it's the government's position that Mr. Serrano was not prejudiced by the single isolated instance of misconduct. Were you the trial lawyer in this case? No, I was not, Your Honor. Do you accept the proposition that you have some kind of a burden to demonstrate that he was not prejudiced? If the Court uses the harmless error standard rather than the plain error standard. And I don't want to spend a lot of time on it. It was in our brief. But it's our position that under Federal Rule of Evidence 103, the party objecting to evidence has to state the specific ground for the objection. All right. So how would you have objected to this improper line of questioning? I probably would have said improper question concerning credibility of witness. Well, usually when trials are going on, lawyers don't have that much time to come up with, oh, gee, we all know this is wrong. The prosecutor knows this is wrong. Which of the many reasons that courts have written about why asking this question is wrong should I stand up and say right now in the spur of the moment without especially when judges frown on long-winded state argumentative objections? I mean, I think he did the best he could under the circumstances and certainly got the message across. I understand, Your Honor, but there were several lengthy speaking objections by the public defender in this case, the public defender on several occasions when. Well, you know, I mean, I guess people don't. This question's been wrong for a long time. At least six years, Your Honor, yes. And prosecutors ask it. Why? I can't give an explanation, Your Honor. It was the attorney from our office who was trying the case who asked the question. I know that in the U.S. Attorney's Office in the Central District of California, the AUSAs are specifically trained not to ask this question. Unfortunately, our office litigates cases all over the country, and our prosecutor did not know that the question was improper. Is it proper in some circuits? I know it's – I've been told it's improper in the Sixth Circuit. Somebody told me a few days ago it's not improper in the Eleventh, but I don't know for sure, Your Honor. You didn't do the research to figure this out? I mean, your office should know when it comes out here to try a case whether a question is going to be proper or improper, and my question is slightly different. It seems to me everybody here in the Ninth Circuit, including the judges, knows that asking a question that pits the credibility of the government agent against the defendant is wrong, yet they still do it. So I think they're doing it because they perceive that they're getting some advantage out of it. Otherwise, why would they do it? Our prosecutor sincerely asked the question because he did not know it was improper. I wish your prosecutor was here arguing this today so we could ask him. I'm sorry, Your Honor. He's not. But he really did not know that it was improper. The question will not be asked by anybody from my office again. The message has certainly gone out to our office. All right. That's fine. It's almost a thing where I'm beginning to think there should be a role of presumed prejudice from asking the question because everyone knows it's wrong, yet people still do it in this district too, in cases from the Central District, tried by Central District lawyers. And I think the Central District does. You know, there's an old rule, when in Rome, do as the Romans. And the first thing that the department has to do when they go into a different jurisdiction with which they're not familiar is sit down with somebody and say, okay, we're going to go to trial here. Is there anything we ought to really watch out for, especially if you're telling me the rules are different in different circuits? You know that. I mean, that was one of the – I was on both ends. I was a United States attorney and back in Washington, and one of the reasons why the United States attorneys aren't particularly happy sometimes when people come out from Washington is because they're not sure what they're doing and they step on a lot of toes in these various districts. This is one of these cases, I guess, is what you're telling us. I understand, Your Honor. And all I can say is he did not know, and we will not be making that mistake again. It certainly was not intentional. It's something that we thought we could gain an advantage and get away with. So why was it – why shouldn't we take cognizance of the mistake in this case? Because it was not prejudicial and did not affect the outcome of the proceedings in this case. And how do we know that? As Your Honor pointed out, the answer that Mr. Serrano gave was not a statement that the agent had lied. I think in the best light his answer could be seen as ambiguous. It was not a case such as the Coombs case where the testimony was emphasized in closing. Our prosecutor never mentioned what Mr. Serrano had said during that questioning in his closing argument. Unlike the other cases, our evidence was extremely strong. As the court has pointed out, we didn't have to show from day one that he knew that this was a fraudulent transaction and that he acted with intent to defraud. But there was certainly, I believe, overwhelming evidence that by the time he sent those documents to First International Bank in Connecticut and received the loan funds, that he knew that he was involved in a fraudulent banking transaction. He did use aliases from the very beginning in this case. The documents that he submitted to First International Bank are not extremely complicated documents. The first one that he submitted, which was Exhibit 1, which is one of the three documents that the government is using as the basis for the bank fraud count, is a commercial invoice. He conceded that he writes invoices in his own business all the time. It's clear from the invoice that he was stating that he had actually sold this equipment that was being shipped to the Philippines, and it was $1.3 million worth of equipment. It's clear from Exhibit 1 that he is stating that he has received a down payment of $199,000 when he conceded he didn't receive any down payment. The second document, Exhibit 2, is a packing list listing 18 separate boxes in one crate where he was supposedly shipping equipment to the Philippines. He admitted that he cut and pasted these documents and signed them. They're simple one-page documents for him to suggest that he didn't know what he was signing. It's almost like res ipsa loquitur. These things speak for themselves. Pretty closely to that. Go ahead. Well, just on the judicial instruction part that you distinguish combs, what bothered me also in this case was that the district court judge didn't give a limiting instruction or strike the evidence right at the time, and instead she overruled the objection, which I think compounded the problem with the question. Well, she didn't give a limiting instruction. Or curative, but she overruled the objection. Right. And let the jury consider the answer in combination with the question. But at no time did defense counsel ask for any kind of limiting or curative instruction. What kind of instruction are you supposed to ask for when the question is overruled? Obviously, that's an issue. But the defense counsel certainly never asked for reconsideration on this issue, and there were extensive jury instructions on who is to determine the credibility of witnesses. So there certainly were the normal jury instructions given on that issue. What's the effect of jury instructions given belatedly? The opposing counsel indicates that those don't have the same effect as an instruction given at the same time. I'm sorry, I didn't understand the question. So the normally we say a curative instruction will cure that sort of error because the jurors are presumed to follow their instructions. But opposing counsel makes the point that it may be a different rule when the jury instructions are not given at the time of the error, but given later. But again, jury instructions couldn't have been given because the court overruled the objection. Well, actually, what the court should have done is sustained the objection and should have striked the question and the answer and told the jury not to consider it. I agree, Your Honor. If I can just address one brief point. The defense counsel in both of his briefs states that the length of the jury deliberations in this case should be a factor in determining whether or not there was prejudice. Contrary to what he stated in both of his briefs, the jury deliberations did not go on for five days. They began on September 12th after Rule 29 arguments, after closing by both sides, and after instructions to the jury. The jury then went to lunch, and that is indicated on page 800 of the record excerpts. At the end of that day, the deliberations were recessed until September 18th at 9.30, and that's indicated by docket entry number 84. The verdict was returned sometime that afternoon. It's unclear at what time. So for what period of time did the jury deliberate according to your calculation? Part of one afternoon and a portion of the next day. That's all. They returned their verdict sometime the afternoon of September 18th. It's unclear what time, but the court greets counsel with a good afternoon, so we know that at least they lasted from 9.30 until sometime in the afternoon. Could you be so good as to provide us with a letter brief as quickly as you can regarding the jurisdictions, the circuits in which this is not an improper question? If there are, yes, Your Honor. I'll let the court know either way. One way or another. Absolutely, Your Honor. Was this the first case that this person had tried in the Ninth Circuit in the Central District? I believe it was, Your Honor, although he tried cases in other places. Why doesn't a prosecutor like that come out? Is that person still in the department? Yes, Your Honor. Is there any reason why he doesn't come out to argue the case himself? Because I handle appeals from our office, and the line attorneys normally do not handle their own appeals. But sometimes they do? Very rarely. I can't think of an instance except once in maybe six years when a line attorney has handled his or her own appeal. You might reconsider that because we've had some of these kinds of cases. Judge Wardle and I have both had these kinds of cases together where the cause of justice is well served by having the lawyer who did it present to argue the case. Just a thought. I hope we don't have too many more misconduct appeals. Well, we don't even need to call it misconduct. I think we use that word too often. It's an improper question, and it's really, to me, it's very troubling in a case. Where all of the evidence is circumstantial as to the specific intent to defraud a bank. I mean, I don't think it's – I'm not sure that using phony invoices and being involved in a nefarious business transaction, whether he was suspicious of it or not, necessarily means he had the specific intent to defraud the bank. And so this is a very close case for me, notwithstanding all these documents. And even the statement doesn't quite say, I knew I was involved in a bank fraud conspiracy. So it is very, very close. And sometimes those kinds of questions do affect the outcome. So I don't know. This is – and it's your burden. That's the third thing. It's your burden of convincing us that it did not. There were other statements that Mr. Serrano gave, the written statement on May 6th, where he signed a statement to the Postal Inspection Service saying, ever since the transaction, worry was always in the back of my mind because I know a fraud was done with my complicity. It seems to, again, suggest or prove that he knew that he was acting with intent, at least by the time the documents were submitted. To what extent was he personally benefiting from all of this? He received $28,000, and he testified that – and he told both the Postal Inspection Service and others that his business was not doing well, that he needed the money, and that's why he decided to get involved in the transaction, notwithstanding that he had no experience in exporting or international transactions. The other two, the co-defendants were tried in the District of Columbia. The co-defendants are still fugitives, Your Honor. Oh, they're fugitives.  And the case is still pending in the District of Columbia. They remain fugitives at this time. Okay, well. Thank you, Your Honor. Thank you. You were well over your time bit, and so as government counsels do, you can have a minute for rebuttal, just a couple points. I'm sorry, Your Honor, I didn't hear what you said. You were well over your time, but if you have a couple points you want to make, you can have a minute or so for rebuttal. Thank you, Your Honor. Six days or not? Yeah. That's what I was going to talk about, Your Honor. Thank you. The reason that I put that down is because the docket entry is confusing. It says, jury retires to deliberate. Then it says, jury trial continued to 9-18. That, to me, didn't make any sense, because if the jury retires to deliberate, why doesn't it say jury deliberations continue to 9-18? The other thing I did, and I can just tell the Court this, obviously, this is not technically in the record. Not technically in the record? It's either in the record or it's not? It's not in the record in that I didn't put it in the record. I mean, it's available on the Court's website. Okay. And it says that the court reporter that was assigned to Judge Snyder was in her courtroom from that Monday, because the deliberations began on Friday. So from that Monday through Thursday, she was in the courtroom, so it wasn't that the court was blacked out. In other words, that the judge wasn't there. I also can say that I wouldn't have put that in there if I hadn't spoken to defense counsel, whose recollection was that it was a little bit longer than just what the government has alleged here, that it was basically a day or two days. If the Court is concerned about that, and again, I didn't put this in my implied brief, but if the Court is concerned about that, and if that's an issue for the Court, perhaps I could suggest that a limited remand to augment the record might be appropriate. And I apologize for not asking that. And just one other point I wanted to make as far as what the government said regarding Mr. Serrano's statement, ever since the transaction where he was in my mind, that statement is ambiguous at best. The government had the opportunity when they were questioning him, well before trial, to ask him what he meant by that. It actually is in favor of the defense because ever since the transaction convened, as he explained, when he was asked the question at trial, that that means that after the transaction was over, he was worried that there was something going on, especially after he went to that party where there were some other people there, and he explained to them that this kind of business is a good business, and they said you need to be careful because there's a lot of fraud going on. And I think that's what he meant when he said that. But be that as it may, the government had the opportunity to explain that by questioning him, they never did. And so I think it actually goes in our favor and does not support the government's agent's testimony that he said from the beginning he knew that there was something wrong. When did he hand over the $900,000 and some change check to people who left? It was on April 16th, Your Honor. It was after the money was obviously disbursed, it went into account that he was instructed to set up with another member of the people that the Ongs trusted, and then he wrote the check. And the check for $939,000 was to Ildefonso. His testimony was he believed that some of that was profit, but also that he believed that Ildefonso Ong had actually purchased the items and he was going to use that to pay some of the vendors that he had purchased. Would you be able to just submit something by letter, briefly, quickly, rather than asking us to do a limited remand to nail down the time of the jury deliberations? Yes, Your Honor. And perhaps you and the government lawyer who actually tried the case might even jointly submit something. Yes, Your Honor. Very well, Your Honor. Thank you. Thank you. All right. United States v. Serrano is submitted. We'll take that United States v. Lama Torres.
judges: Trott, Wardlaw, Ikuta